UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF LOUISIANA

DAVID WAYNE VAN BEBER

VERSUS

JOHN R. "JOHNNY" PASSMAN, JR., ET AL

John R. Passman, Jr. LAND DEVELOPMENT, LLC
Nancy Slade Rimes Passman
Howard White, Cleta White &   PETITION
Keith Brinkman

CIVIL ACTION #

**10-3853**

DIVISION

**SECT. D MAG. 1**

NOW INTO COURT, COMES DAVID WAYNE VAN BEBER, PRO SE, seeking redress and relief from

this court for injury, damages, and losses brought about through the actions, efforts, enterprises

and practices of the named defendant, Johh R. "Johnny" Passman, Jr. and his employees,

business partners, associates, brethren kindred spirits, and assorted conspiring cohorts and

cronies, hereinafter referred to as et al.

Additionally, I am seeking immediate assistance and intervention in defending myself in legal

matters, currently open and unresolved, in the 22nd Judicial District Court involving myself,

defendant Passman, and wrongdoers Cleta White, Howard White and Keith Brinkman.

Passman, et al, has attempted, and is still attempting to deprive me of my home, my work, my

freedom, my right of association, and my right to the pursuit of happiness, and has also injured

Maureen King and her children Adam and Bailey King by attempting to deprive them of same.

Plaintiff seeks damages for injury caused by Passman, or by the actions of those working for or

doing favors for him.

✓ Fee _Pauper_
___ Process
_X_ Dktd _____
___ CtRmDep _____
___ Doc. No. _____

1

Additionally, Passman has conspired with Keith Brinkman, Howard White, Cleta White and others in an attempt to evict, illegally, King and myself from our home and property, and is still engaged in efforts to conspire to cause me harm through use and abuse of the courts and law enforcement officers in Washington Parish.

It is my belief and understanding that Passman's behavior, activities, actions, words, and business practices, as related in this petition and as will be more fully described within twenty days of the date of filing of this petition, demonstrate specifically, meet the definition of, and illustrate a pattern of racketeering activity as described in 18 USCS §§1961-1968 et.seq., particularly in light of Passman's often heard self-proclaimed status as the "Number Three Property Owner in Washington Parish."

I have attached a copy of the RICO Standing Order, and will, pursuant to the order, provide within twenty days, with specificity, the dates, times, and places of all known racketeering activity, as well as the names, if known, titles, associations, corporations, cooperations and known affiliations of wrongdoers and conspirators, as well as the names of injured parties and victims to the best of my current knowledge, and the names of others, currently unknown, will be stated with specificity within twenty days pursuant to the RICO standing order.

## I. The Chapel Hill Covenant

In summary, Maureen Louise King and I entered into a purchase agreement in March 2006 to obtain a parcel of land from defendant, Passman, and subsequently signed a bond for deed agreement on April 14, 2006 for the parcel known as Chapel Hill Lot 15. Nancy Slade Rimes Passman, signed on behalf of John R. Passman, L.L.C. as a grantor, as did John R. Passman, Jr. (Exhibit A)

On the first day that I arrived with a construction crew and commenced to building on Lot 15, a neighbor, Keith Brinkman, Lot 39, came to meet me, introduced himself, and told me that this area was a "klan compound." My construction crew consisted of 16 men, some of whom were African American, Afro-Honduran and Hispanic. I knew Mr. Brinkman's remark was directed to my men, and I laughed uncomfortably and told him that I'd make sure that I let federal agents know about him. At the time, there were no buildings on Brinkman's property, and he didn't live there, though it did make me wonder about the other neighbors.

That same week, I asked Howard L. White, II, Lot 42, who I had hired to do some tractor work, what he thought about "the klan" and he told me that he "loved" the klan. I noticed a Virgin Mary statue in his yard, and I told him that the "klan" persecuted Catholics. He replied that he didn't care, that he "loved the klan."

At the time, I didn't perceive these people as a threat because they seemed so ridiculous, and I thought these statements were lame attempts to in some way bond over racism. I didn't realize at the time they were enforcing unwritten aspects of the covenant agreement that Passman held with the residents of the Chapel Hill development.

In the summer of 2006 Brinkman also let me know that he had killed deer on my property by shooting them from his property. I found him, on the whole, disturbing, and so did King and her children, Bailey King and Adam King, at the time ages 17 and 15.

For the next three years every time Mr. Brinkman saw a visitor who wasn't white at my house, he either approached with a Winchester Rifle (with scope) on a strap over his shoulder, or he

would shoot into the bank of his pond overlooking my property. Brinkman regularly shoots animals that visit his pond, and his property is the only one with a body of water on it in the development. He has killed numerous birds, wild animals and dogs belonging to me and to others in the community, and puts out poison to indiscriminately kill animals, as well. I finally told Brinkman to stop coming over to our property because he "creeped out" King and her children, and that him coming over with a gun was particularly threatening to them and to me.

On June 1, 2006, King and I signed another bond for deed agreement to obtain a second parcel of land, Lot 14 adjacent to Lot 15. (Exhibit B) The parcels of land on Chapel Hill were, and are, advertised as "owner financed" and Passman, himself, encouraged us to take advantage of the opportunity to finance the bulk of the cost of the land, even though we had funds sufficient to buy the land outright. On at least two occasions in 2007, we inquired about the "payout" on the loan, and were discouraged from paying the land off, and encouraged to put our cash into the buildings on the property. Passman told us he would be "hit" with a huge tax penalty if we paid him off and that he liked getting payments every month as he was planning to retire, eventually, and payments provided him with regular, future income. (Violation of 18 USCS § 1962, (a) (b) (c) and (d).)

From 2006 to 2008, we resided in Covington where King's children were enrolled at Covington High School, and we commuted to the Chapel Hill properties while building the structures and landscaping and developing the land for more gardens. In 2008, we made a decision to move to the property full-time, and to devote the bulk of our time and resources to the farm, as we called it. We had been recognized earlier that year for our efforts when King was awarded the Tim Sykes Award, and the gardens were thriving. (How Does Her Garden Grow - Exhibit C) As

King's salary at Tulane University was sufficient to cover land payments and expenses, I decided to devote myself full time to working on our house and growing food for myself, my family and for sale to others.

Brinkman and White did not appreciate or support our efforts at organic gardening, and ramped up their repugnant behavior. They lit toxic fires on the hills above our property and White would bring construction debris and assorted plastic to the site to burn, ruining our air and poisoning the ground water. (Exhibit R.) Brinkman burned household trash, mattresses and the like, right on top of the only pond in the community. With his penchant for shooting animals that tried to water at his pond, it just couldn't get much uglier. But it did.

**II. Interfering with State of Louisiana Department of Environmental Quality Investigation**

In November 2009 I called Passman to complain that White, an employee of Passman, was burning construction debris, plastic and other highly toxic items on a regular basis across the street from us, and we were very concerned about the impact this burning was having on our health and on our garden, and in particular, the impact on King's daughter, who had a compromised immune system from extensive chemotherapy and radiation following surgery for a brain tumor in 2004. Passman knew of our intentions, and also knew that we were not using pesticides or industrial fertilizers, as we wanted our food to be grown naturally.

We had taken great pains and exerted much effort to grow food and create an environment that is clean and healthy, and calls to Passman and the local authorities about the White's trash burning did nothing to dissuade White from burning toxic materials.

In fact, in November of 2009, Passman became angry when I suggested, in another phone call, that White's burning was dangerous to both himself and those around him, and that his own

5

health appeared to be deteriorating. Passman told me that White was healthy and virile, and that his plastic burning wasn't hurting anyone and I had better get used to it. He also threatened to bulldoze my house. As I knew the conversation had deteriorated, I thanked him for listening and said goodbye.

On November 17, 2009 King made inquiries with the State of Louisiana Department of Environmental Quality regarding the problem, and decided to file an anonymous complaint. (Exhibit D, 11/17/2009) A few days later, Richard Gianelloni called King regarding the complaint and encouraged her to make an official complaint using her name in order to assist them if they needed more information, and for her to be kept apprised of the investigation. King told him Passman was a hothead, and that she was afraid he would lash out against her for making the complaint, but she filed a report naming White on November 20, 2009, and an additional complaint on November 23 against Passman, specifically, for White burning additional debris on another property in the area owned by Passman. (Exhibit E – Report PUSS 1480 and Exhibit F Report OUYS 1482).

On December 2, apparently after hearing news that we had filed a report to investigate burning at White's residence, Passman called King's office and left an ominous message on her voice mail saying "….we have a serious problem…and David is probably the victim here .. I am going to do something about it… y'all may have to leave your property… having the D.E.Q. jumping all over my case, etc… you better call me... (Original message exists on Tulane voice messaging system and a digital copy can be provided.) (Violation of 18 USCS § 1961 (Sections 1510, 1511, 1512, 1513)

King immediately notified D.E.Q. investigator James Dardar of the call, and asked him if he had visited or contacted Mr. Passman yet. He told her he had NOT contacted him, as he had not even reviewed the second report filed against Passman. King was alarmed by Passman's threat, and in the weeks to come made calls and inquiries to local and federal law enforcement agents regarding his threat. She was told by both Dardar and Duty Agent Bezet of the Federal Bureau of Investigation that it sounded like hot air, and that unless he carried through and actually did something, threats like that didn't amount to anything serious.

King was afraid of Passman, and asked me to take over further dealings with him and make the next payment. On January 30, 2010 I went to Passman's office and paid him in cash, bringing our account up to date. His office was in the same building as his store, The Cavalier Shop, and he was holding a "going out of business" sale at the time. I tried to repair the relationship with Passman by expressing dismay that White's bad behavior had caused problems between us. Passman was somewhat conciliatory and assured me that there would be no more plastic burning at Chapel Hill.

### III. Lot 16 - The Purchase Agreement

In May 2010, we met Kevin Morgan-Rothschild through King's daughter, Bailey King, who was and is currently a student on the dean's list at Tulane University. (Exhibit G) Bailey told us that Morgan-Rothschild, a friend and fellow student who worked with her at the Neutral Ground Coffee House in New Orleans, was interested in sustainable development and green building, and that she thought we would like him and that she had told him about our projects. We met him later that month at a vegan pot-luck supper, and invited him to come up to our farm to see what we had done.

Bailey had gone to Mexico for the summer to stay with her grandparents, and before the month was through, Morgan-Rothschild and his friend, Ryon Winfield Bourdon, came up to the farm to stay for the weekend. Bourdon and Morgan-Rothschild are from Amherst, Massachusetts, and they came to New Orleans to go to Tulane. They both love New Orleans and plan to stay in the area, and they were thrilled with the prospect of having a place in the country, near New Orleans, where they could grow food. They shared our enthusiasm for the beauty of Stoney Point and were inspired by our farm, our buildings, our gardens, and what we were planning to do with the property. When we told them that Lot 16, adjacent to our land, was for sale, and that we wanted to buy it ourselves to expand our gardens, they said that they had the money to buy the lot right now.

We were excited about having some like-minded neighbors who were friends of King's daughter, too, and we told them they could stay at our house as they built their place, and that we would help them get started with their corn field. (Re: Back Yard Corn Field) We told them all they had to do was call Passman, as he owner financed, and they could probably get started right away. We knew Passman was eager to sell the property, and we had talked to him about buying it ourselves.

Morgan-Rothschild and Bourdon immediately made an appointment to meet with Passman, and brought another friend, Christopher Skladzien, with them to their meeting to sign a purchase agreement on June 18. (Exhibit H) Skladzien, a recent graduate of Loyola University from Bay St. Louis, Mississippi, also shared a passion for organic gardening and sustainable development. Bourdon asked Passman if they could till up the field right away, as they wanted to get some corn in the ground as soon as possible, and Passman said that was fine. We had begun work on our first building before signing the bond for deed contract with Passman's blessing,(Exhibit I)

so this was not out of the ordinary. Passman told them to come back to sign a bond for deed contract on July 1st.

That day, I drove the 1959 Farmall Cub that I bought from Passman in 2006 onto Lot 16, and we began planning for the corn field and building. I also moved building materials and my truck onto the property, as it has a trailer and hydraulic lift to haul materials and tools.

Morgan Rothschild was busy with work for the U. S. Census Bureau, and stayed in New Orleans, but Bourdon and Skladzien brought another friend to stay at our farm. Darryl Williams, a WTUL disc jockey and African American from Florida who recently graduated from Loyola University. Williams was interested in Lot 16, too. Bourdon told him he was welcome to be a part of their project. We told Williams that there was a loft in what we call the barn, and that he could make himself at home in that building, which he did. Bourdon and Skladzien had been staying in the other building, but we were running out of beds.

On or about June 25, Bourdon and I were stopped on the road by a neighbor's son (Lot 23, Robert, last name unknown, Burt's son) who told us that White and others in the community were going to have a "klan" meeting about the "black guy in the barn." The messenger, Burt's son, was not invited personally to the klan meeting, presumably because his father, Burt, is Hispanic. We were dismayed to hear this, to say the least.

Over the next two weeks, Morgan-Rothschild and Skladzien had vacation plans, and they asked Bourdon to get a postponement of a few days to sign the contract, as neither would be back before July 1st. In the meantime, White was displaying threatening behavior in his operation of the tractor for Passman.

At sundown on June 30, 2010 he come across the ditch on a four wheeler and drove up and down the property line separating Lot 15 and Lot 16, stopping the vehicle just yards from our porch, revving the engine and acting as if he had a firearm. He seemed to be high on amphetamines, which he admits to taking for treatment of his narcolepsy. (Reference July 8, 2010 Hearing transcript, when acquired). White had never mowed the grass on Lot 16, and had not brought the tractor across the ditch since I had hired him to do some work for me in 2006. I told him to get off of Bourdon's property and away from our house.

Bourdon immediately called Passman to tell him that White was not needed or welcome on Lot 16, that he had a tractor he could use, and the grass didn't need "mowed." He also told Passman that White was acting crazy and that we were all afraid of him.

Later that evening, two Washington Parish Sheriff's Officers paid us a visit, and told King and Bourdon that "Johnny" called them and told them that he had sent White to cut the grass on Lot 16, and that we were to allow White access to Lot 16 to do his job in the morning, or else. One of the officers said he was a friend of Johnny's. I told the white sheriff, in front of the African American sheriff, that White had threatened us with the Ku Klux Klan because we had a black man here, and that we did not want White anywhere near us, and that Passman could send someone else to mow the grass, but we didn't want White near us with heavy equipment. (Copy of police report from June 30, 2010 will be provided when obtained from Washington Parish Sheriff's Office.)

Bourdon called Passman again that evening and told him that we had our own tractor, and that we didn't need White to cut the grass, and that his behavior was threatening and frightening to Bourdon, King and myself.

On July 1st Bourdon went to the meeting with Passman to request a postponement. Cleta White was at the meeting, too. Bourdon asked Passman if he could have a few more days to sign the contract, as Morgan-Rothschild and Skladzien were out of town. Passman told Bourdon he could sign the contract without them for the time being, that he didn't need them, and they could do paperwork later if they wanted to be a part of it.

Bourdon signed the contract, but before he gave the paper back to Passman, he told Passman he wanted to talk to him about "the issue of racism" and proceeded to tell him that he heard about White's planning of a "klan meeting" because Darryl Williams was staying on the property. Bourdon told Passman that Williams wanted to be a co-buyer of the property, too, and that he was African American. Passman told Bourdon that would "be like putting a speck of dirt in a white pail of milk" and got red faced and said "don't fuck with me boy" – he then reached across the desk and grabbed the contract from Bourdon, tore it up and told him  "now you get the hell out of my office" reaching under his desk as if he had a gun. Bourdon left the office traumatized by the experience, afraid of Passman and Cleta White, with his original purchase agreement, and without his $500 deposit.


Unbeknownst to us, Passman had begun legal, or rather, illegal proceedings against King and I in an attempt to seize our property by illegally cancelling our bond for deed contract in the Washington Parish Conveyance Records (Violation of 18 USCS § 1961 (Section 1341) and had begun orchestrating a campaign to get neighbors to file requests for a hearing to obtain protective orders against me, while he filed a Petition for Eviction, as well. (Exhibit J, Passman v.VanBeber, 22nd JDC, Div. D. # 101126)  (Denied. Order signed by Judge Peter Garcia but judgment not yet filed in the record.)

It must have been a busy day in downtown Franklinton! Passman's office is just steps from the courthouse and the Washington Parish Sheriff's Office. And wasn't this the same day Passman had met with Bourdon and threatened him? It appears to be the case! Apparently Passman's threatening of Bourdon in front of Cleta White inspired both of them to take action against me immediately. (Violation of 18 USCS § 1961 (Section 1503, and 1510, 1511, and 1512)

**Restraining Orders, Hearings and a Petition for Eviction**

I did not know of Passman's full intentions nor of his fraudulent filings into the court record and the conveyance records of Washington Parish in a coordinated conspiracy to evict us from the Chapel Hill properties until I was served with the petition for eviction in custody at the jail in Washington Parish on July 7, 2010. (Exhibit K)

Passman and Howard White's mother, Cleta, also an employee of Passman, requested restraining orders against me after meeting with Bourdon, and I was served with notice of same on the morning of July 2, 2010, with a summons to appear in court on July 8, 2010 for a hearing on those orders.

At that point, I was somewhat relieved that we would be going before a judge to discuss the events that had transpired in the three days preceding, and Bourdon said he still wanted to assert his right to buy the property based on his agreement to purchase and deposit. (Exhibit H)

A few hours later, I was attending to my truck and trailer on Lot 16 when Howard White nearly ran over me with Passman's tractor. There was a clearly marked No Trespassing sign on the property, placed there by Bourdon. White looked like he was out of his mind or asleep at the wheel and I was afraid he was trying to kill me because I had just been served with notice of a

12

hearing for a temporary restraining order at the request of his mother, and I didn't know what she had alleged to begin with. I also didn't think it was a coincidence that hours later, I had her son, Howard White, barreling down on me with a tractor. I threw rocks at the tractor to let him know I was in his path, as it appeared he didn't see me and was going to run me down. I jumped on the trailer of my truck and he turned off and left the property. The John Deere tractor had a broken window.

Two sheriff's officers came to my property shortly thereafter and Bourdon told them that White attacked me and that I was getting a lawyer. The police left, and came back on July 6 and arrested me on false charges of aggravated battery and criminal destruction of property. There was no investigation that I know of, and I have yet to see the complaint or the police report. To my knowledge no investigator has come to the crime scene or questioned any of the witnesses to the events that White alleges happened that day. Moreover, in court on July 8, 2010 Howard White, under oath, admitted he had sustained no injury and showed his leg, which he had claimed was injured. If he had any scratches or cuts on him, they weren't visible and he didn't even indicate that he had any bruises, either. This certainly does not rise to the level of aggravated battery, a very serious charge.

At the hearing on July 8, 2010 several other issues of fact were brought to light through the testimony of Howard White, Cleta White, Passman and Bourdon, and Howard White and Passman's testimony contradicted their own sworn affidavits and one another's testimony.

Either White or Passman lied under oath that day, as White said he was working for Passman, as did the Sheriff who came to the property on June 30th at "Johnny's" request, while Passman said that White doesn't work for him, he does him "favors." Apparently one of the favors he does for

Passman is keeping the milk "white" on Chapel Hill Road. Passman and Howard White's behavior regarding Williams presence on our property, and Passman's refusal to consider Williams as a co-buyer on Lot 16 meets the criteria of a Hate Crime under federal law pursuant to 18 § USC 245, and represents a violation of the Fair Housing Act, as well.

Passman's tractor was almost always parked at White's residence, and White used the machinery almost every day. Neighbors Dennis and Anna Taylor had complained to Passman on earlier occasions that White's operation of the John Deere was dangerous, and that they didn't want him doing anything to the road around their property. Passman ignored any and all complaints made against White relative to his operation of heavy machinery in the course and scope of his employment for Passman, or in his daily favor-doing for Passman.

Apparently, Brinkman and Howard White requested additional protective orders against me on 6 July, the day I was arrested. (Exhibit L) I was served in jail with those orders, and with the petition for eviction from my property. While incarcerated, I was not given a phone call for ten days, talked to no lawyer, and laid injured on a concrete floor for over two weeks. My bond was set at more than $21,500.

King was having difficulty trying to maintain her job and our farm while trying to get me out of jail and trying to find an attorney to help her with the eviction. Passman actually had his attorney file an opposition to King's pro se request for an extension of time to try and save the property from a default judgment or instant eviction. Ultimately, King filed a memorandum opposing his opposition, and was granted an extension of time.

Before the hearing on July 8, 2010 Passman attempted to get other neighbors on Chapel Hill Road to file for protective orders, or to show up at the hearing to testify against me, including

Linda Perrone and her husband (Lot 10). No one else showed up to testify. Only Brinkman, and the Whites, both of whom work for Passman. (Violation of 18 USCS § 1961 (Sections 1503, 1510, 1511, 1512, 1513)

Before the hearing the Perrone's called and pressured Anna and Dennis Taylor to get on board, or go with them, or show up and testify at the hearing. Taylor had prepared a statement in my defense, but became afraid to go to the hearing and asked Bourdon to "leave her out of it" because she and Dennis have two young children in their home. Bourdon complied, and we certainly understood her concern. (Violation of 18 USCS § 1961 (Section 1503, 1512, 1513)

Perrone told the Taylors that Passman said I was not who I said I was, that I was a dangerous man leading a double life under a false name, and that King did not even know my real name and she was going to testify against me at the hearing. The Taylors were told the Perrone's were offered a forgiveness of debt on their past due land payments in exchange for testimony against me. Linda Perrone also told Anna Taylor she was afraid to say no to Passman. In the past, it is claimed that Passman offered to accept sex from her in lieu of payment on the property. Brinkman also pressured the Perrones to make false statements alleging that they were afraid of me. Passman also told Charles Martin (Lot 8) lies about me, and tried to persuade him to testify that he was afraid of me at his office in July 2010. Violation of 18 USCS § 1961 (Section 891, and Sections 1503, 1510, 1511, 1512, 1513)

Passman attempted to use the courts to make good on his threat of 2 December 2009, and to deprive us of our property, and to date, I am paying for the restraining orders that he got against me, unable to defend myself or contest the order without a transcript from the July 8, 2010 hearing. Additionally, I am facing a felony charge in the 22nd JDC.

15

I have been unable to obtain a copy of the transcript from the hearing held on July 8, 2010 in the 22nd JDC, and have been unable to determine the name of the judge or magistrate that presided at the hearing that day. I had assumed it was Childress, as his name and signature are on the restraining orders, but recently I saw Judge Childress for the first time in my arraignment hearing, and he is not the judge who presided at the hearing on July 8. (Exhibit L – Restraining Orders 101108, 101109, 101118, 101119).

Numerous calls and a written request to the clerk of court and two court reporters to obtain the transcript from the hearing have been fruitless. I have serious concerns that something unusual is going on, as Jamie Terriot, the court reporter who was scheduled to be in court that day, said that the case numbers for the orders as shown are showing up as someone else's traffic court proceedings.

I request this courts immediate assistance in obtaining the transcript from this hearing, as it contains direct testimony from my accusers relative to the charges made against me and the events that resulted in my arrest and pending trial for a felony charge. If it is necessary for me to file a motion in the 22nd J.D.C. in order to achieve that end, please advise accordingly.

Passman's actions since November 2009 were threatening and intimidating, and Passman's intention was to take our property and run us away from Chapel Hill, as we are impeding his "development" of the community in the way that he envisioned it - as an enclave with no African American residents where the folks can burn their plastic, pvc and mattresses to their heart's content.

Passman used Howard White, Cleta White and Keith Brinkman to threaten, harass and intimidate me, King, her children and my house guests, and to attempt to deprive us of our property, and in

my case, my freedom, as well. He also intimidated, damaged and injured Bourdon, Skladzien, and Morgan-Rothschild, and his actions were particularly damaging and disturbing to Darryl Williams. Passman's actions and statements to Bourdon on July 1' 2010 are in direct violation of the Fair Housing Act. Correspondence to Eric Holder, Attorney General of the United States, was mailed to the U.S. Department of Justice. A copy of the letter is attached, and I ask that the court adopt the letter's content into this petition. (Exhibit M)

Howard White's operation of Passman's heavy equipment is criminal or should be, as he is an admitted narcoleptic with a prescription for amphetamines. Is there not a better candidate to hire in the area to grade the gravel road with several bus stops? I wrote to the State Police relative to my concerns about our safety, and have attached a copy of that correspondence, as well. (Exhibit N) To date, I have not heard anything from the State Police, and White continues to operate Passman's equipment, with Passman often lurking nearby in his truck. It's downright ominous.

Additionally, Passman, Brinkman, Cleta White and Howard White used the courts and local law enforcement to attempt to have us illegally evicted from our property, and to have me incarcerated and charged with a felony. They also made false statements to obtain temporary and permanent restraining orders against me that I now have to pay for. Passman's actions recounted herein, and his filings in the record rooms, with the notary, and in the courthouse are proof that he has committed crimes against King and I.

Like an arch villain in a bad movie, Passman told Bourdon in June 2010 that we better get "lawyered" up as he had a surprise for us and he was going to bury us in legal fees, gloating that he is a multi- millionaire and the "Number three property owner in Washington Parish."

17

Passman made attempts to get other people on Chapel Hill Road to testify against me at the 8 July hearing, and investigation (or the record) will show that he even paid the costs for Brinkman and the Whites to bring the requests for restraining orders against me. Violation of 18 USCS § 1961 (Sections 1503, 1510, 1511, 1512)

Passman filed false documents into the court record to illegally cancel our bond for deed agreement, and since we have been notified that the judge decided in our favor to deny the eviction, he has again notified us through his attorney that we are in default on the property, making a demand for payment, and citing new reasons that we are in violation of the contract so that he can pursue eviction even after receipt of the payments he claims to be owed. (Exhibit S)

All of this before a judgment has even been entered into the record, and providing no proof that a cancellation of his illegal cancellation of both properties has been entered into the record pursuant to Judge Garcia's Order and Reasons. While we are pleased with the ruling in our favor, we are skeptical that Passman is done with his attempt to illegally seize our property and deprive us, again, of our right to life, liberty and the pursuit of happiness at Stoney Point.

While you can't put a price on shattering someone's dream, you can ask them to pay you for the damage they have done, and that too is the purpose of this petition. I respectfully ask this court to find, in my favor, that Passman et al deprived me of my rights, and tried to literally deprive me of my property through an illegal eviction and cancellation of two bond for deed contracts in the Washington Parish Record. (Exhibit O, Exhibit P)

I haven't, to date, had the property and the buildings assessed, but I can provide proof that I spent in labor and materials more than $250,000 on this project. I can also attest to and provide testimony from friends and family that, while they love the place, they just don't want to be

around "this." I can certainly understand their hesitation, considering what happened to the last people, that I know of, who thought that Chapel Hill Road was the perfect place to pursue their dream.

Passman's bond for deed agreement and restrictive covenant were instruments of fraud that he used in an attempt to seize our properties illegally. The documents are ambiguous, and appear designed to be able to be used against anyone at any time if they aren't towing the line. Further, the agreements and covenant bring us into a relationship with Passman that we would rather not have, given our discovery of his policy of depriving African Americans of their right to buy property on Chapel Hill Road.

Passman admitted at the hearing on July 8 that he has done possibly "hundreds" of evictions, and several people in the community have told us that others have lost their property through possibly illegal summary eviction proceedings, too. The summary eviction and default judgment appears to be one of Passman's preferred *modus operandi*, and his cancellation of the bond for deed agreement is part of that process. As the cost for copying the numerous cancellations of bond for deed agreements and other land transactions that involve John R. Passman or John R. Passman Land Development, L.L.C. in Washington Parish is probably going to be high, I'd like to request a waiver of the costs associated with producing that evidence, or respectfully request the court's assistance in gaining access to those documents and being provided with the means to reproduce them in a way that meets with the evidentiary requirements of this court.

As both King and I are named on separate contracts for Lot 14 and Lot 15, Passman's cancellation of the bond for deed contracts in the parish record, alone, represents four separate instances of fraud and filing false documents into the parish records. His wife, as signatory and

witness to the illegal cancellations, is a wrongdoer, as well. Violation of 18 USCS § 1961 (Section 1956, 1957)

Passman has used Cleta White, Howard White, Keith Brinkman, and officers of the Washington Parish Court and Sheriff's office to threaten and intimidate myself, King, Bourdon, Morgan-Rothschild, Skladzien, and Williams. Violation of 18 USCS § 1961 (Section 1503, 1510, 1511, 1512)

While the sheriff is presumably following the law by answering Passman's calls, the Whites, Brinkman, and Passman's wife have conspired with Passman, on behalf of him and his land development corporation to defraud King and I, specifically, and to discourage and deprive Bourdon, et al of their right to purchase the property known as Lot 16.

**Background and Basis for Appropriateness of RICO Claims**

Passman has a reputation on the Northshore as a "kingpin." His self-proclaimed status as the "Number Three" landowner in the parish was echoed by a number of residents of Washington, St. Tammany and Tangipahoa Parishes. In fact, calls and inquiries by King to multiple lawyers to attempt to find counsel to defend our eviction were met with refusals based on conflicts of interest, as Passman has had occasion to do business with numerous law firms in his business as a land "developer." I am not sure if there is a law against calling what Passman does to the land in Washington Parish "development" but if there isn't, there should be.

One attorney that King met with refused the case after he noticed that William Burris, counsel for Passman on the petition for eviction, was the son of the 22nd J.D.C. Judge William Burris whose name was on the citation accompanying the petition. (Exhibit K)

Apparently Passman's reputation as a drug kingpin was enhanced in 2010, particularly after the local newspaper published an article supposedly written to squash the rumors of "bigwigs" being arrested. (Exhibit Q. Rumors of "big wigs" arrested)

While no names were mentioned in the article, the rumor mill from Mimi's in the Marigny to Mandeville was buzzing about Passman and "the preacher" who had been picked up and released, supposedly for possession of several kilos of cocaine. While I was in custody in Washington Parish for 17 days, I was told by several people that Passman was the top "TOP top" drug dealer in the parish and that everyone knew you didn't mess with him. Some of the inmates provided specifics about drug dealing and Passman getting away with things that were illegal on a daily basis.

### Summary and Plea for Relief and Judgment

After we bought the land at Stoney Point in 2006 we heard rumors about Passman, but we didn't perceive him as a threat. He seemed more of a comic figure, as his hairpiece and his dress were outrageous. I asked him about his fancy hair-do and he told us he had been in the "music game" when he was young, and that he was a showman. He even had a larger than life cardboard cut-out of himself in a tiny bathing suit on display in his fancy office.

Other Washington Parish landowners in the Stoney Point area told us that Passman had been famous as a "bad ass" since high school, where he was a champion boxer with a reputation as a sadistic bully. It has been suggested that I got on Passman's bad side when I called him from the home of neighbor, Lane Bullock, as Lane's brother had "kicked Passman's ass" in high school and no one had ever forgotten that.

The talk around town speaks to Passman's status in the community, and magnifies the reality of the very real threat that I have been living under since Passman decided I was "going to be the victim in this." Right now, countless people are afraid of Johnny R. Passman because of his reputation. The article in the paper made him, or some other "big wig" seem to be above the law, or bigger than the law. After all, if the arrest alluded to in the article really happened, he must be really powerful! Passman appears to be going about all of his enterprises with impunity.

I, too, am afraid of his intentions, and, again, seek the court's protection in assuring that I get a fair trial in Washington Parish. At the very least, I pray that this court assist me in obtaining the transcript from the hearing on July 8, 2010 at the court's earliest convenience.

Lying under oath or in a sworn affidavit is a crime, and attempting to illegally seize someone's property is a crime, too. Passman, Brinkman and the White's filings and sworn testimony on the affidavits used to obtain restraining orders against me contain contradictory and false statements, and they themselves contradicted other sworn testimony made in court filings in the matters 101108. 101118. 101109 and 101119 under oath in court on July 8, 2010.  Violation of 18 USCS § 1961 (Sections 1503, 1510, 1511, 1512)


Additionally, their testimony at the hearing on July 8, 2010 raises many questions relative to the relationship between Passman, Cleta White, Howard White and Keith Brinkman. It appears that Passman pays Cleta White for work that Howard White does for him, as Howard White is trying to receive or is receiving disability payments for his narcolepsy. This, too, is a crime.

Everyone in the Chapel Hill community knows that Howard White works for Passman, yet Passman denied this under oath in the courtroom on July 8, 2010. If White doesn't work for

Passman, why did Passman call the sheriff and demand that White be permitted to "work" on Lot 16 on July 1, 2010?

Passman began threatening us in November 2009, and he used Brinkman and White to make us miserable on an almost daily basis by encouraging or not discouraging illegal burning.

When I was released, weak and sick, from jail, and under a restraining order, White again charged at my house on a tractor and drove back and forth, threatening King before she left for work in the morning. King called the Sheriff that day, and two officers came out and talked to White. This kind of behavior is ongoing, and apparently endorsed and financed by Passman.

We knew from the beginning Brinkman and White were racist Philistines, but we didn't know, until recently, that they were doing Passman's bidding by behaving badly while we had company that wasn't white. It wasn't until Bourdon asked Passman directly about his policy relative to selling land to African Americans that we realized he not only endorsed their behavior, but had probably encouraged and financed it. We recalled a day we saw Passman drive some African American prospects through Chapel Hill. The next day Howard White raised a Rebel flag on the pole in front of his house, placing it over the American flag. On several occasions we have had visitors who were Hispanic, African American and Vietnamese who expressed concern about the area, hearing coincident gunfire, and seeing the Rebel flag as a sign they were not welcome.

Since my arrest, I have been visited by other neighbors and have been told by more than one other resident of Chapel Hill that Passman "assured" them that there wouldn't be any blacks in this community when they were looking at the property. He apparently thought that depriving African Americans of the right to buy his property was a selling feature at Stoney Point! This, of course, is a violation of the Fair Housing Act. Another crime, and another conspiracy.

23

I do not want to be in a covenant or a contract with a man who is refusing to sell property to people based on their race or religion, or who is rumored to be a narcotics trafficker. I do not want to help him launder his money or assist him in creating an exclusively white community. It is not legal to conduct business this way in the United States of America, and I am certain that an investigation into this matter would be fruitful. I wrote a letter to U.S. Attorney Eric Holder, attached as Exhibit M, stating the facts regarding discrimination on Chapel Hill Road to the best of my ability, but I have yet to receive a reply. I have also had numerous conversations with agents from the Federal Bureau of Investigation regarding this issue. To date, I do not know what their investigation has found, if there is one.

It is my belief that Passman has engaged in racketeering activity as it is defined under RICO 1961, et seq., and I am in the process of compiling information, with specificity, relative to the instances, dates, the injured parties, the wrongdoers, conspirators and witnesses to these crimes, some of which have been set forth in this petition. It is also my belief that he and others to be named with specificity benefitted from prohibited activities as described in violation of 18 USCS § 1962 (a), (b) (c) and (d).


I pray that this court excuses, temporarily, the lack of specificity in this petition, as I am compelled to petition you immediately to address the difficulties that I am facing in obtaining documents from Washington Parish that are crucial to defending myself against the felony charge prior to a pre-trial hearing on December 2, 2010.

I requested a public defender in Washington Parish at my arraignment on October 13, 2010, as I did while I was incarcerated, and I have yet to speak to an attorney about my case. The charges

against me are serious, and I fear that I may not get a fair trial on this matter if I can not obtain the transcript from the aforementioned hearing on July 8, 2010.

I do not know how to assert my rights beyond asking this court to intervene in this matter.

I will provide the court with details within twenty days pursuant to the RICO standing order, providing information relative to the crimes I believe fall under RICO §§1961 et seq. and the prohibited activities that I am aware of in violation of Violation of 18 USCS § 1962 (a) (b) (c) and (d).

I pray that you consider the facts set forth in this petition, and provide me, and any and all other named parties injured by Passman, et al, relief from his criminal behavior and redress for injuries caused by him or by others doing his bidding or working in association with him to further his own status and enrich his person, his corporation(s) and his enterprise.

As I can prove that I spent more than $250,000 on this project for the benefit and enjoyment of my family and friends, and as retreat for King's daughter, Bailey, in particular, I respectfully request that the court render a judgment in my favor for damages of $750,000. It is my understanding that under RICO §§1961, et seq. I would be entitled to compensation at three times the damages claimed in a typical civil suit.

Passman, the Whites and Brinkman have deprived us of enjoyment of our property, our right to free association and even tried to deprive us of our right to clean air and water in violation of local, state and federal laws, even going as far as to interfere with the investigation by threatening King and myself on her voice mail at her office at Tulane University.

If it seems unbelievable that King and I, or Bourdon, Morgan-Rothschild and Skladzien are still interested in the property on Chapel Hill Road, it's because it's beauty and charm are beyond

description. In Spring 2010 I found artifacts below the topsoil while I was digging my corn field on the property. (Exhibit S) It appears, from the nature of the artifacts, that Lot 14 and Lot 15 were the site of an earlier cornfield, planted by Native Americans who lived here long before Passman began his "development" of the land.

As to the injured parties Bourdon, Morgan-Rothschild and Skladzien, I respectfully request that the court order Passman et al to pay them for the corn field they never got to plant, and give them the property that he tried to deprive them of the right to buy. They entered into an agreement in good faith, and he deprived them of their money and their right to freely associate, and their right to purchase a property on Chapel Hill Road in violation of federal law.

Respectfully submitted,

David Wayne Van Beber
36978 Chapel Hill Road
Franklinton, LA   70438
(985) 869-2913

## Certificate of Service

I hereby certify that a copy of this petition has been mailed this date to William H. Burris, known counsel of record for defendant John R. Passman, Jr. by U.S. Mail, postage prepaid and properly addressed.

New Orleans, Louisiana, the 18th day of October 2010

David Wayne Van Beber